UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAVID STANLEY,

                              Plaintiff,

          -v-

CITY UNIVERSITY OF NEW YORK, ELMER PHELON,
ANTHONY BRACCO, NEIL STEWART, SUSAN
JEFFREY,

                             Defendants.

---

18 Civ. 4844 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

Plaintiff David Stanley ("Stanley") seeks damages and injunctive relief from City University of New York ("CUNY") and four of its current and former employees—Elmer Phelon ("Phelon"), Anthony Bracco ("Bracco"), Neil Stewart ("Stewart"), and Susan Jeffrey ("Jeffrey") (collectively, "individual defendants," and, with CUNY, "defendants")—on claims relating to his chronic kidney disease. Dkt. 77 ("Second Amended Complaint" or "SAC"). His claims—predominantly of discrimination, retaliation, and hostile work environment—are (1) against CUNY, under the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. §§ 701 *et seq.*, and (2) against the individual defendants, under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. §§ 2601 *et seq.*, New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290, and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 *et seq.* SAC ¶¶ 159–76.

Defendants move, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss the SAC. Dkts. 107, 109 ("Mot."). For the following reasons, the Court grants the

motion. The Court dismisses Stanley's claims under the Rehabilitation Act, ADA, and FMLA with prejudice, and dismisses his NYSHRL and NYCHRL claims without prejudice to his right to pursue those claims in state court. The Court also denies Stanley's second motion for leave to file a Third Amended Complaint.

## I.    Background

### A.    Factual Background[1]

#### 1.    The Parties

Stanley is a New York resident. SAC ¶ 8. Since December 15, 2008, he has worked as a maintenance and labor supervisor at John Jay College ("John Jay"). *Id.* ¶ 15. He graduated as an HVAC technician from TCI College, where he also took up "Blueprint reading" and electrical work. *Id.* ¶ 113. As of the filing of the SAC, he had more than 20 years of experience in renovations and maintenance mechanics and nearly 16 years of experience in supervising skilled trades. *Id.*

CUNY is a network of colleges, including John Jay, that is licensed by the New York State Board of Regents. *Id.* ¶ 10.

---

[1] The facts are drawn from the SAC. Dkt. 77. For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of Stanley. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

In his opposition brief, Stanley cites facts contained in his proposed Third Amended Complaint ("TAC"). *See* Dkt. 125 ("Opposition" or "Opp.") at 1 n.1. Stanley also attached nine exhibits to his opposition brief, including the original complaint, Dkt. 124-1, the first amended complaint, Dkt. 124-2, the proposed TAC, Dkt. 124-3, photos of his work area, Dkts. 124-4, 124-5, 124-7, a floor plan of the work area, Dkt. 124-6, and productivity charts for his department, Dkts. 124-8, 124-9. The productivity charts were incorporated by reference in Stanley's proposed TAC. *See* Dkt. 124 ¶¶ 8–9. Because the Court denied Stanley's request to file the proposed TAC, *see* Dkt. 128, the Court refers only to the SAC—and does not consider the facts contained in or the exhibits attached to the proposed TAC—in deciding the motion to dismiss.

Phelon was, at all relevant times, executive director of facilities management at John Jay. *Id.* ¶ 11. Phelon was "the ultimate authority" in Stanley's department. *Id.* ¶ 33.

Bracco was the director of facilities management at John Jay. *Id.* ¶ 12. In 2017, he replaced Phelon as executive director of facilities management. *Id.* The SAC alleges that Bracco and Phelon were "the ultimate decision makers for the various adverse actions against [Stanley] and directly participated in that discrimination." *Id.* ¶ 156.

Stewart was Stanley's administrative supervisor at John Jay. *Id.* ¶ 13.

Jeffrey succeeded Stewart as Stanley's administrative supervisor, at a time the SAC does not specify. *Id.* ¶ 14. The SAC alleges that Stewart and Jeffrey "condoned and supported Bracco and Phelon's discriminatory and retaliatory acts." *Id.* ¶ 157.

### 2.    Stanley's Kidney Failure and Transplant

Stanley suffers from chronic and acute kidney disease that "culminated in a kidney transplant, and as such, [he] has suffered from a mental and physical impairment that substantially limits one or more major life activities." *Id.* ¶ 9. Sometime in 2009, he was first diagnosed with kidney failure and undertook many medical treatments. *Id.* ¶¶ 16–17. In particular, Stanley underwent hemodialysis—a process in which excess waste products and water are removed from his blood through the use of a machine—"usually" three times a week, with each session lasting approximately four hours. *Id.* ¶¶ 18–19. While Stanley was undergoing treatment, he was "substantially limited in his ability to cleanse and eliminate body waste" and "experienced severe fatigue and mobility challenges." *Id.* ¶¶ 20–21.

In February 2014, Stanley received a kidney transplant. *Id.* ¶ 22. After the transplant, he took six months of medical leave under the FMLA, and continued to be "impaired in his ability to cleanse and eliminate body waste and . . . substantially limited in several additional major life activities, such as mobility." *Id.* ¶¶ 22–23, 27, 28. He also received immunosuppressive

3

treatment to ensure that his body did not reject the transplanted kidney. *Id.* ¶ 25. As a result of the transplant and ensuing treatment, he was absent from work for a "significant amount of time." *Id.* ¶ 24. His immune system remains "severely impaired" such that he is prone to kidney infections and secondary opportunistic infections. *Id.* ¶ 26.

### 3.   Defendants' Treatment of Stanley

The SAC alleges that Stanley "received disparate treatment because of the necessary time away from work in connection with his medical conditions." *Id.* ¶ 29. He states that, even though he "has been able to perform his essential job functions with certain reasonable accommodations, which included working in adequately ventilated rooms and working without exposure to toxic or unhealthy substances," defendants denied such accommodations and "intentionally made [his] work conditions intolerable." *Id.* ¶¶ 30–32.

#### a.   November 2013: Office Relocation

In November 2013, pursuant to a decision made by Phelon, Stanley was relocated from an office in a suite with similarly ranked employees to a storage facility in CUNY's basement.[2] *Id.* ¶¶ 42–43, 47. This office "is makeshift with no walls and no privacy," and defendants continued to store there items such as furniture, cleaning machines, light bulbs, cleaning towels, and scaffolding after Stanley's relocation. *Id.* ¶¶ 44, 46. No other management or employees work in this area. *Id.* ¶ 45. Phelon told Stanley that he needed Stanley's former office as a storage room for John Jay's blueprint records, which, the SAC claims, could have been stored "in many other locations throughout the College." *Id.* ¶¶ 48–49, 56.

---

[2] Defendants contest Stanley's characterization of this area. *See* Mot. at 5. On a motion to dismiss, however, the Court must accept as true all well-pled factual allegations in the complaint, *see Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), and thus does not consider defendants' alternative depiction of Stanley's workspace.

The SAC alleges that defendants relocated Stanley "to harass him," retaliate against him, "make [his] work experience difficult," "humiliate him," and "undermine him." *Id.* ¶¶ 42, 49–50. Working in the storage room further impaired Stanley's immune system and raised the risk of serious health complications, due to exposure to dust particles and exposed sewage and the later occurrence of construction work described below. *Id.* ¶ 51. This work included the cutting of steel beams over his head, which resulted in steel dust "fogg[ing] up the entire room and cover[ing] the office." *Id.* ¶ 53. The SAC alleges that his relocation "served no legitimate purpose nor fulfilled any real business need," and that there is available office space outside of the basement area that has been used instead to store clothes and paper. *Id.* ¶¶ 50, 54–55.

After Stanley was relocated, defendants "continued to harass him and scrutinize him and continued to berate him for his medical absences." *Id.* ¶ 57.

> b. *2014 & 2015: Negative Performance Reviews and Review of Medical Records*

"On many occasions," Phelon expressed frustration to other managers, including Anne Goon, the administrative superintendent, about Stanley's medical conditions, physical impairments, and need for medical leave. *Id.* ¶ 33.

Phelon and Stewart also issued "unfair negative performance evaluations" and "write ups" in "retaliation for [Stanley's] medical leaves." *Id.* ¶ 35. On October 16, 2014, Stewart issued, and Phelon approved, a "negative" write-up "for [Stanley's] absence of two months during his kidney transplant procedure and convalescence," for failing to maintain accurate records for a vehicle for six months. *Id.* ¶¶ 36–37. Stanley and his co-workers, when transporting materials, were required to complete forms regarding the condition of any vehicle in use, its mileage, the status of its gas tank, and where the vehicle was parked. *Id.* ¶ 38. During the six months at issue in the write-up, Stanley had either been undergoing the kidney transplant

or recovering from the surgery on leave, and thus was unable to keep vehicle records. *Id.* ¶¶ 37, 39.  He had received approval for "all absences for his medical condition." *Id.* ¶ 36.

In 2015, Stanley was told that Phelon instructed another employee to review Stanley's medical records without his knowledge, violating his privacy and privacy laws. *Id.* ¶ 34.

And "for the year 2015," Stewart issued, and Phelon approved, a "very biased and negative" work performance evaluation. *Id.* ¶ 40.  The evaluation "made express reference" to Stanley's "excessive absences for poor health." *Id.* ¶ 41.

c.    *Pre-2015: Removal from Hiring Committee & Hiring Process*

The SAC alleges that the "harassment, sabotage, write ups and negative work appraisals" "directly led" to Stanley's removal from the hiring committee, a "group of employees who collectively decide who to employ." *Id.* ¶¶ 66–67.  Stanley's position on the hiring committee, which he was part of as a maintenance supervisor, had been "one of his key roles." *Id.* ¶¶ 66, 68.

In 2015, defendants hired six employees without notifying or consulting Stanley, who was their "direct supervisor." *Id.* ¶ 70.  These employees included James Grampus and Luis Camacho. *Id.* ¶¶ 71–72. All maintenance employees hired after 2015 were told that Stewart was their supervisor and not to report to Stanley even though, as the SAC alleges, he was and remains their supervisor "according to the official titles." *Id.* ¶¶ 69–70, 73.

d.    *2017–2018: Destruction of Work Orders*

In or about 2017–2018, defendants "started to destroy Mr. Stanley's work orders." *Id.* ¶ 58.  In addition, CUNY's college assistant told Stanley that Stewart had directed him not to submit Stanley's work orders from the log sheets, and Stewart directed the front desk not to input Stanley's work orders into the computer system. *Id.* ¶¶ 59–60.  Stewart threw away Stanley's work orders, with the exception of those regarding supervision of electricians. *Id.* ¶ 61.

6

>       e.      *2017–2018: Change in Job Description*

At some point in 2017–2018, Bracco directed Stewart to change Stanley's job description to encompass supervision of electricians and carpenters. *Id.* ¶¶ 58, 62.  Stanley filed a grievance with his union, asserting that defendants were requiring him to perform out-of-title work, requiring him to be on call, or "standby," without compensation, and denying him the requisite "expanded pay" for these "additional job duties." *Id.* ¶¶ 63–64.  The union held that defendants had violated the collective bargaining agreement by assigning to Stanley duties "substantially different from his Supervisor Job Description," and ordered defendants to pay Stanley, for the time period at issue, the difference between the pay given to those with the supervisor title and the pay given to those with the administrative superintendent title. *Id.* ¶ 65.

>       f.      *July 2017: Negative Write-Up & Complaint to State Division of Human Rights*

In July 2017, Stanley was written up and "falsely blamed" for the discharge of an employee under his supervision. *Id.* ¶ 101.  That month, Stanley filed a discrimination complaint with the State Division of Human Rights ("SDHR") for "all the discrimination and retaliation he had been subjected to." *Id.* ¶ 102.  After filing the complaint, Stanley—who was eligible to receive "standby overtime" since 2012 and was "typically" assigned overtime—was informed that he would no longer be compensated for "standby overtime," even though defendants "continued to require that he be available for work during his days off." *Id.* ¶¶ 117–18.

>       g.      *September 2017: Construction Work & Request for Relocation*

Starting on September 25, 2017, defendants began constructing a "disabled access lift" in the building, which required the installation of support beams to secure the floor. *Id.* ¶¶ 74, 78. Bracco, the college's head of space planning, and the college's space planning and design/facility coordinator were all involved in deciding to install the lift. *Id.* ¶ 97.  The beams

7

were installed directly above Stanley's head in the basement storage area, and the work—including scraping insulation off the beams, cutting through the flooring, and cutting through the beams—was performed "often while [Stanley] was there working." *Id.* ¶¶ 75–77. The construction "caused extensive debris to collect in [Stanley's] work area and emitted toxic substances," including from the installation of fire-retardant materials, that Stanley was "forced to inhale." *Id.* ¶¶ 79–80. The emission of toxic substances caused Stanley to feel "very ill and lightheaded," and on "many occasions," he left work "feeling very ill and nauseous and he had difficulty breathing." *Id.* ¶¶ 80–81. Working in these conditions was "potentially life threatening" given Stanley's medical conditions. *Id.* ¶ 84.

On September 25, 2017, Stanley emailed CUNY's director of environmental health and safety, Lindsey Kayman, complaining of working in his assigned area during the construction process and being covered in dust and steel particles. *Id.* ¶¶ 82–83. He copied the email to Bracco, Stewart, Jeffrey, and Goon. *Id.* ¶ 85. Bracco "was responsible for ensuring that [Stanley's] work environment was safe and did not pose a risk to his health." *Id.* ¶ 98. Kayman inspected Stanley's workspace and "told him she could see he was being exposed to 'danger'" and that he should send her further emails if defendants "continued to use chemical substances or toxic materials." *Id.* ¶ 86. Kayman also sent an email to Bracco, Stewart, Jeffrey, and Goon that "instruct[ed] that [Stanley] needed to be relocated immediately" and directed them to contact her to "discuss this situation." *Id.* ¶ 87. Bracco sent, without copying Kayman, an email to Stanley stating that "he had not been made aware that Mr. Stanley's workspace would be affected by the construction work." *Id.* ¶ 89. The SAC alleges that Bracco's statement was false, and that Bracco never directed that Stanley be relocated to a safe working environment. *Id.* ¶¶ 90–91. Bracco instead "threatened" Stanley by "summoning Union representatives so that he could issue

Plaintiff with a disciplinary write up." *Id.* ¶ 92.  Bracco told Stanley that he scheduled a meeting

with union representatives to discuss Stanley's email to Kayman, which purportedly "angered"

Bracco and was "evidence" of Stanley being "difficult." *Id.* ¶ 93.

At some point, John Jay's occupational safety and health department investigated the

situation and determined that Stanley's work conditions were dangerous. *Id.* ¶ 88.  Still, the

SAC alleges, defendants made "no efforts" to provide him with a safe work environment. *Id.*

At another point not specified in the SAC, Bracco agreed that Stanley could be moved to

a conference room. *Id.* ¶ 94.  However, Stanley was unable to move to the conference room

because defendants "refused to set up a computer there or any other equipment to permit

[Stanley] to work," and he thus was forced to continue working in the basement area. *Id.* ¶¶ 95–

96.  The "only effort" to improve Stanley's work environment during the construction work was

covering the ceiling with plastic and duct tape, a "makeshift" solution that did not bring any

"marked" improvement in Stanley's work conditions. *Id.* ¶¶ 99–100.

       *h.*     *March–May 2018: Right to Sue from EEOC & Filing of this Lawsuit*

On March 1, 2018, Stanley received a notice of right to sue, dated February 26, 2018,

from the United States Equal Employment Opportunity Commission ("EEOC"). *Id.* ¶ 4.

On May 31, 2018, Stanley filed his complaint in this case.  Dkts. 1, 2 (re-filed).

       *i.*     *October 2018: Negative Work Appraisal*

After Stanley filed this lawsuit, he experienced further "reprisals."  SAC ¶ 103.

On October 10, 2018, Stewart issued, and Bracco approved, a "very biased negative work

appraisal" that "claimed, without substance or support, that [Stanley] had failed to complete

projects." *Id.* ¶¶ 104–05.  The SAC alleges that this appraisal contained false information, as his

department had in fact been exceeding its yearly quotas and goals. *Id.* ¶¶ 105–06.  Stanley wrote

a "detailed" rebuttal and submitted documents to demonstrate that Stewart's claims were false. *Id.* ¶ 107. Ann Susan, the administrative superintendent, issued a revised work appraisal that also contained "false and biased claims."[3] *Id.* ¶¶ 108–09. These included that Stanley had failed to order certain equipment, although the SAC alleges that he had tried to order the equipment and defendants had withheld funds to purchase it. *Id.* ¶ 109.

> j.      *March 2019: Denial of Interview for Promotion*

Based on the discriminatory and retaliatory write-ups, the SAC alleges, Stanley was "passed over for various positions for which he was qualified, in favor of non-disabled individuals, and/or in favor of individuals who had not engaged in protected activities or taken medical leaves of absence." *Id.* ¶ 110. On March 28, 2019, Stanley was passed over for a promotion to the title of administrative superintendent level 4, with a salary of $95,000. *Id.* ¶ 111. Stanley was not interviewed for the position "ostensibly because he was ineligible for the promotion due to the negative disciplinary write up." *Id.* ¶ 114. The position was instead filled by a custodial administrative superintendent, who the SAC alleges was "unqualified for the position" and lacked "prior experience in renovations or maintenance mechanical work." *Id.* ¶ 112.

> k.      *March 2020–September 2021: COVID-19 & Denial of Request to Work Remotely*

In March 2020, defendants directed supervisors and managers who were not required to perform manual or physical work to work from home due to the COVID-19 pandemic. *Id.* ¶ 120. In July 2020, Stanley's physician "directed a more enduring solution," in which Stanley would continue to work remotely beyond summer 2020 due to his ongoing risk of serious complications

---

[3] The SAC alleges that Susan issued the revised work appraisal on October 10, 2018, the same date on which Stewart allegedly issued the original appraisal. *See* SAC ¶¶ 104, 108.

from COVID-19. *Id.* ¶ 121. On July 17, 2020, Stanley sent defendants, including Bracco, a medical note from his physician "instructing that he be permitted to continue to work remotely due to his medical conditions." *Id.* ¶ 122. The note was also sent to various human resources ("HR") and benefits employees. *Id.* ¶ 123.

On October 1, 2020, after HR failed to respond to the request for several months, the head of HR, Oswald Fraser, advised Stanley that he could work remotely on a "trial basis" and requested time to speak with Stanley. *Id.* ¶¶ 124–26. On October 2, 2020, Fraser and Bracco called Stanley and recommended that he work remotely on a "trial basis." *Id.* ¶ 127. Stanley "could not agree to this temporary accommodation" and "feared a reversal unless Defendants issued a more enduring directive to work from home." *Id.* ¶ 128. After the call, defendants "refused to provide" an answer or clarification on Stanley's request, even after Stanley requested updates via email. *Id.* ¶ 129.

In June 2021, Stanley received his first and second doses of the COVID-19 vaccine. *Id.* ¶ 132. On July 6, 2021, defendants required Stanley to report for work at the basement storage work area. *Id.* ¶ 130. To travel to work, Stanley had to take a bus and a train, "forcing him to be potentially exposed to COVID-19 and other pathogens." *Id.* On July 19, 2021, Stanley took an antibody test, which indicated that his immune system "had not produced necessary antibodies to the coronavirus and hence he did not acquire any immunity from the vaccinations." *Id.* ¶¶ 133–34. That day, Stanley provided defendants a note from his physician that stated that Stanley had failed to develop antibodies following vaccination and remained at high risk of contracting COVID-19. *Id.* ¶ 136. His physician ordered that Stanley be permitted to work remotely "until further notice." *Id.* ¶ 135.

On July 26, 2021, Stanley sent an email to Fraser, copying Bracco and Jeffrey, that

stated:

> It's been over a year since my first request Mr. Oswald, when [I] originally asked
> for reasonable accommodation. On two occasions I have submitted letters from my
> physician, the second on July 19, 2021, in regard to my medical condition and what
> should be considered. I have tried to do what I can so that I may come into the
> college and perform my duties. However, as both the letters state it is
> recommended that I should work from home, but no decision has been made on
> your part as per the reasonable accommodation policy. I am aware you are going
> to have an interactive process, but I believe this is something that should have
> already been addressed given the time the first request was submitted.

*Id.* ¶ 137.

> Fraser responded the same day, stating:

> I hope you and your loved ones are doing well. [I]nteractive process to make a
> determination for these types of requests. We have begun working on your request
> and will contact you shortly to engage in the interactive process. We appreciate
> your patience and understanding as we process this request.

*Id.* ¶ 138. Defendants, however, "refused to permit [Stanley] the accommodation" of working

remotely and "refused to engage in an interactive process." *Id.* ¶ 131. They required Stanley to

report to work daily, "putting his health in serious jeopardy." *Id.* ¶¶ 139, 141.

On August 9, 2021, the associate director of HR instructed Stanley to work remotely until

further notice. *Id.* ¶ 142. Notwithstanding this, Stanley, for reasons the SAC does not explain,

was "forced to use annual leave time" and is currently on paid administrative leave. *Id.* ¶¶ 143–

44. On September 17, 2021, Fraser informed Stanley that defendants denied his remote-work

request on the basis that the "essential functions" of his role "cannot be performed remotely" and

"undue hardship" would result from "reassign[ing] [Stanley's] essential functions to another

employee." *Id.* ¶¶ 145–46. Fraser offered Stanley one accommodation for his in-person work:

wearing a mask and social distancing during all interactions. *Id.* ¶ 147. Fraser stated that the

college would provide masks if needed. *Id.*

The SAC alleges, however, that Stanley "had already been satisfactorily performing all his essential duties remotely and without issue for at least 14 months." *Id.* ¶ 148. He experiences panic attacks and anxiety due to the requirement because he commutes by public bus and trains. *Id.* ¶ 151. CUNY permitted other managers and supervisors to work remotely, including the school's director of accessibility resource lab and testing, who is asthmatic, and the college's health services and emergency funding director. *Id.* ¶¶ 149–50.

As of the filing of the SAC, defendants "continue to harass [Stanley] and to deny him accommodations for his disabilities." *Id.* ¶¶ 119, 158. Due to the harassment and hostile work environment, Stanley has developed serious retinopathy, which may cause permanent damage, and has been required to wear reading glasses since March 1, 2017. *Id.* ¶¶ 152–53. The harassment has also caused Stanley to experience anxiety, depression, and stress-related health issues such as heart palpitations, lightheadedness, and shortness of breath. *Id.* ¶ 154. He is still undergoing immunosuppressant therapy, and has a "severely compromised immune system." *Id.* ¶ 140.

### B.    Procedural History

On May 31, 2018, Stanley filed his first complaint, bringing claims against CUNY only, under, *inter alia*, the ADA, Title VII, and the NYCHRL. Dkts. 1, 2 (re-filed). On October 16, 2018, Judge Nathan approved the parties' proposed briefing schedule for a motion to dismiss the complaint, and directed Stanley to notify the Court whether he would amend his pleading. Dkt. 10. On November 16, 2018, CUNY filed its first motion to dismiss. Dkts. 11–12. On December 13, 2018, Judge Nathan granted Stanley leave to file an amended complaint, Dkt. 18, and on January 7, 2019, Stanley filed the First Amended Complaint ("FAC"), *see* Dkts. 19, 20, 23, 24 (re-filed), 25. It alleged, against CUNY, claims under the ADA, section 504 of the Rehabilitation Act, and the NYSHRL. Dkt. 24. The parties then briefed CUNY's motion to

13

dismiss, with CUNY's motion filed on February 13, 2019, Dkts. 26–28, Stanley's opposition filed on March 5, 2019, Dkt. 31, and CUNY's reply filed on March 19, 2019, Dkt. 32.

On September 30, 2019, in a decision that was later vacated, Judge Nathan dismissed with prejudice Stanley's complaint, on the grounds that (1) the ADA and NYSHRL claims were barred by sovereign immunity; and (2) Stanley failed to address CUNY's arguments as to the Rehabilitation Act claims. Dkt. 33. On November 21, 2019, Judge Nathan issued orders stating that Stanley had notified the Court of a "serious conflict of interest" during his then-counsel's representation of him[4] and directing Stanley to move under Federal Rule of Civil Procedure 60 for any relief sought. Dkts. 36–37. On December 18, 2019, Stanley, now proceeding *pro se*, moved under Rule 60(b) and (e) for relief from the Court's order dismissing his claims. Dkt. 40; *see also* Dkt. 41. On January 29, 2020, CUNY opposed Stanley's Rule 60 motion, Dkts. 46–49, and on February 12, 2020, Stanley replied, Dkt. 50. On November 19, 2020, Judge Nathan granted Stanley's motion under Rule 60(b)(6), concluding that Stanley's counsel's "conflict of interest and the poor quality of representation," "in combination," justified granting the motion. Dkt. 51. She vacated the decision granting CUNY's motion to dismiss and directed Stanley to file a second amended complaint within 90 days. *Id.*

On June 21, 2021, Judge Nathan granted a request by Stanley, now represented by successor counsel, to stay the deadline to amend his complaint in light of an anticipated voluntary dismissal. Dkt. 58. On June 25, 2021, CUNY requested that the action be dismissed with prejudice. Dkt. 59. On July 8, 2021, Stanley advised the Court that he in fact intended to

---

[4] Judge Nathan ordered Stanley's then-counsel, Courtney Davy, to show cause as to why the matter should not be referred to the District's Grievance Committee. Dkt. 36. On January 10, 2020, Davy filed a letter stating that he had not "in any way acted in any manner to jeopardize Mr. Stanley's case." Dkt. 45.

file an amended complaint as to claims under the ADA and Rehabilitation Act and dismiss certain other claims. Dkt. 60. On July 28, 2021, the Court granted Stanley's motion to amend his complaint. Dkt. 64.

On September 28, 2021, Stanley filed the SAC—the operative complaint today. Dkt. 77. On January 10, 2022, Stanley filed proof of service as to CUNY, Bracco, Jeffrey, and Phelon, Dkts. 94–97, and on January 11, 2022, he filed proof of service as to Stewart, Dkt. 99.

On March 25, 2022, defendants moved to dismiss the SAC for lack of jurisdiction, Dkt. 107, and filed a declaration, Dkt. 108, and memorandum of law, Dkt. 109 ("Mot."), in support.[5] On April 10, 2022, the case was reassigned to Judge Engelmayer. On April 14, 2022, the Court ordered Stanley to file his opposition, if any, to the motion. Dkt. 113. That day, Stanley's counsel requested a 60-day extension of the briefing schedule, in part due to their anticipated withdrawal as counsel, Dkt. 114, which the Court granted, Dkt. 115. On May 13, 2022, Stanley's counsel stated that he no longer sought to withdraw. Dkt. 119.

On June 27, 2022, Stanley moved to amend the SAC, Dkts. 123–24, and opposed the motion to dismiss, Dkt. 125 ("Opp."). On June 28, 2022, defendants opposed Stanley's application for leave to amend. Dkt. 127. On July 22, 2022, the Court denied Stanley's motion to amend the SAC. Dkt. 128. On August 22, 2022, defendants replied to Stanley's opposition to their motion to dismiss. Dkt. 131 ("Reply").

On March 1, 2023, Stanley again moved to file a Third Amended Complaint ("TAC") to add claims of retaliatory discharge under the Rehabilitation Act, ADA, FMLA, and NYCHRL,

---

[5] On March 28, 2022, Judge Nathan referred the motion to the Honorable Ona T. Wang, Magistrate Judge, for a report and recommendation. Dkt. 110. On April 13, 2022, the referral order was withdrawn. Dkt. 111.

on the ground that Stanley had been informed that his position at John Jay would be terminated on March 9, 2023. Dkt. 134. On March 2, 2023, defendants opposed the motion. Dkt. 135.

## II.     **Applicable Legal Standards**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *see Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet is "inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

## III.    **Discussion**

Defendants move to dismiss the SAC. They argue that (1) its Rehabilitation Act claims are partially time-barred and that, in any event, fail to state a *prima facie* claim, Mot. at 8–19; (2) its ADA and FMLA claims should be dismissed for lack of jurisdiction and failure to state a claim, *id.* at 23–29; and (3) its NYSHRL and NYCHRL claims should be dismissed because no individual defendant is adequately pled to be liable as an "employer" or "aider or abettor" or to have been personally involved in the conduct at issue, *id.* at 29–36. Stanley opposes dismissal, arguing that defendants' arguments as to the insufficiency of the SAC "hinge on [a] fact intensive inquiry completely unsuitable for dismissal." Opp. at 7.

For the following reasons, the Court grants defendants' motion to dismiss. The Court dismisses with prejudice the SAC's claims under the Rehabilitation Act, ADA, and FMLA, and

dismisses without prejudice its state-law claims under the NYSHRL and NYCHRL. The Court also denies Stanley's latest motion to amend the SAC and, accordingly, closes the case.

**A.      Rehabilitation Act Claims Against CUNY[6]**

The SAC asserts claims for discrimination, retaliation, hostile work environment, and denial of reasonable accommodations under the Rehabilitation Act. SAC ¶¶ 159–63. The Court, with defendants, also reads the SAC to bring a claim based on CUNY's alleged failure to promote him, even though such a claim is not expressly stated.

Section 504 of the Rehabilitation Act prohibits "any program or activity receiving Federal financial assistance" from discriminating against an employee "solely by reason of her or his disability." 29 U.S.C. § 794(a). "The Rehabilitation Act lacks an express statute of limitations; courts thus apply the limitations period of a state's personal-injury laws." *Vega-Ruiz v. Northwell Health*, 992 F.3d 61, 63 (2d Cir. 2021). "In New York, this period is three years." *Id.*; *see also Maccharulo v. Gould*, 643 F. Supp. 2d 587, 592–93 (S.D.N.Y. 2009). Accordingly, the Court will consider only those allegations concerning conduct after May 31, 2015, three years before Stanley's original complaint was first filed, albeit deficiently. *See Am. Council of Blind of N.Y., Inc. v. City of New York*, 495 F. Supp. 3d 211, 242–44 (S.D.N.Y. 2020) (finding

---

[6] Claims under the Rehabilitation Act and the ADA, and some under Title VII, are evaluated under the same standards. *See, e.g.*, *Petrone v. Hampton Bays Union Free Sch. Dist.*, 568 F. App'x 5, 7 n.1 (2d Cir. 2014) (same standard for discrimination claims under Rehabilitation Act and ADA); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (same, for retaliation claims); *Lucenti v. Potter*, 432 F. Supp. 2d 347, 360 (S.D.N.Y. 2006) (same, for hostile work environment claims); *Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019) (same, for failure-to-accommodate claims); *see also Pistello v. Bd. of Educ. of Canastota Cent. Sch. Dist.*, 808 F. App'x 19, 21, 24 (2d Cir. 2020) (analyzing Title VII, ADA, and Rehabilitation Act retaliation claims under same standard); *Knope v. Garland*, No. 20-3274, 2021 WL 5183536, at *4 (2d Cir. Nov. 9, 2021) (analyzing Title VII, ADA, and Rehabilitation Act hostile work environment claims under same standard). Accordingly, this decision cites decisions considering claims under each of the statutes.

untimely Rehabilitation Act allegations occurring more than three years before action filed). The Court therefore does not consider allegations based on defendants' relocation of Stanley's work area in November 2013, SAC ¶¶ 42–56, or the write-up issued in October 2014, *id.* ¶¶ 36–38. Because the SAC does not, *inter alia*, plausibly connect CUNY's alleged conduct after May 31, 2015 to his disability or adequately allege an adverse action, its claims under the Rehabilitation Act fail.

### 1.    Discrimination Claim

Claims of discrimination under both the Rehabilitation Act and the ADA are analyzed using the familiar burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Jackson v. N.Y.C. Dep't of Educ.*, 768 F. App'x 16, 17 (2d Cir. 2019) (summary order); *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013); *Heilweil v. Mt. Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994). At the first step, the plaintiff bears the burden of showing, by a preponderance of the evidence, a *prima facie* case, by establishing that: "(1) his employer is subject to the ADA [or Rehabilitation Act]; (2) he was disabled within the meaning of the ADA [or Rehabilitation Act]; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *McMillan*, 711 F.3d at 125 (citation omitted); *Doe v. Bd. of Educ.*, 63 F. App'x 46, 48 (2d Cir. 2003) (summary order) (applying same to Rehabilitation Act).

"To qualify as an adverse employment action, the employer's action toward the plaintiff must be materially adverse with respect to the terms and conditions of employment." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (citation omitted). The Second Circuit has declined to articulate a "bright-line rule to determine whether a challenged employment action is sufficiently significant to serve as the basis for a claim of discrimination." *Id.* (citing

18

cases). But, to constitute an adverse action, a defendant's conduct must be "more disruptive than a mere inconvenience or an alteration of job responsibilities," *id.* (citation omitted), and must take place "because of," *McMillan*, 711 F.3d at 125 (citation omitted), the plaintiff's disability. "[W]hen a plaintiff alleges an employment discrimination claim under the Rehabilitation Act, the causation standard that applies is the same one that would govern a complaint alleging employment discrimination under the ADA," which prohibits discrimination "*on the basis of* disability." *Natofsky v. City of New York*, 921 F.3d 337, 345–46 (2d Cir. 2019) (citation omitted). This requires that, "'but for' the disability, the adverse action would not have been taken." *Id.* at 347. At the pleading stage, the plaintiff's burden is "minimal," *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 113 (2d Cir. 2019), and the allegations "need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination," *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015) (discussing Title VII claim).

If the plaintiff meets his burden at the first step, the burden of proof shifts to the defendant, who must "articulate some legitimate, nondiscriminatory reason for the employer's conduct." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019) (citation omitted). If the defendant meets that burden, the analysis proceeds to the third step, where the plaintiff must "produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Jackson*, 768 F. App'x at 17 (quoting *Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 231 (2d Cir. 2015).

The Court has considered each alleged adverse action as well as the "sequence of events" in the SAC, *see Wein v. N.Y.C. Dep't of Educ.*, No. 18 Civ. 11141 (PAE), 2020 WL 4903997, at *13 (S.D.N.Y. Aug. 19, 2020). Accepting as true all well-pled factual allegations and drawing all reasonable inferences in Stanley's favor, the Court finds that the SAC does not make out a

*prima facie* case of discrimination. That is because, even assuming that the SAC satisfies the first three prongs, it does not plausibly allege the fourth—that Stanley suffered an adverse action that was taken "because of," *McMillan*, 711 F.3d at 125, his disability.

The Court analyzes each ostensible action, in chronologic sequence. Although addressed initially in the context of the discrimination claim, these acts and events are also the central bases of the SAC's retaliation, failure-to-promote, and failure-to-accommodate claims.

*Phelon's comments to CUNY staff and review of Stanley's medical records*: The SAC alleges that "[o]n many occasions," Phelon expressed frustration to other managers about Stanley's medical conditions and asserted need for medical leave. SAC ¶ 33. It also alleges that Phelon instructed an employee to review Stanley's medical records without his authorization. *Id.* ¶ 34.

The SAC leaves unclear whether Phelon's conduct, although *related* to Stanley's alleged disability, was attributable to discrimination, against those with disabilities. *Cf. Hatch v. Brennan*, 792 F. App'x 875, 878–79 (2d Cir. 2019) (summary order) (finding evidence of defendants' communication regarding insufficiencies in FMLA paperwork, adjournment of meeting about reasonable accommodation request, and failure to properly investigate complaint inadequate to raise inference of discriminatory motivation). But even assuming that the conduct was motivated by discriminatory intent, these vaguely alleged actions by Phelon do not constitute the type of adverse employment action required to state a discrimination claim. The SAC fails to adequately plead that either Phelon's expression of "frustration," SAC ¶ 33, or his instruction of another to review Stanley's medical records were accompanied by any shift in Stanley's work experience or duties—let alone a "materially adverse change in the terms and conditions of his employment," *Pierre v. Napolitano*, 958 F. Supp. 2d 461, 477 (S.D.N.Y. 2013).

*2015 performance evaluation*: The SAC claims that Stewart issued and Phelon approved a "very biased and negative" performance evaluation for the 2015 year that expressly referenced Stanley's "excessive absences for poor health." SAC ¶¶ 40–41. This claim presents a closer call.

That defendants—as alleged—characterized Stanley's absences as excessive arguably permits an inference that Stanley's negative performance evaluation was motivated at least in part by hostility to his disability (that is, discriminatory intent). But, standing alone, "a negative performance review, without any showing of a negative ramification, cannot constitute an adverse employment action." *Natofsky*, 921 F.3d at 352. To bring a negative evaluation to the level of an adverse employment action, the evaluation would need to, for example, alter the plaintiff's compensation, benefits, or job title. *See id.* (citing *Fairbrother v. Morrison*, 412 F.3d 39, 56–57 (2d Cir. 2005), *abrogated on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). The SAC broadly claims that the "negative work appraisals" of Stanley led "directly" to his removal from the hiring committee, *see* SAC ¶ 66, and to his being "passed over" for a promotion, *see id.* ¶ 110. But these conclusory allegations do not link the 2015 performance evaluation functionally to these ensuing changes in Stanley's employment. And to the extent that Stanley might invoke the proximity in time of the evaluation and these alleged consequences, "[f]or mere temporal proximity to establish causality, the intervening period must be very close." *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 316 (S.D.N.Y. 2003) (discussing retaliation claims); *cf. Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 343 (S.D.N.Y. 2020) (collecting in-Circuit cases requiring passage of no more than two months to give rise to inference of retaliatory causation).

21

As to Stanley's removal from the hiring committee, critically, the SAC does not specify when this removal took place. That defendants began hiring employees in 2015 without notifying Stanley suggests that his removal may have preceded the negative evaluation at issue. *See* SAC ¶¶ 66–70. As to the promotional opportunity, Stanley was allegedly passed over for the position in March 2019, years after the 2015 evaluation. *See id.* ¶ 111. There are no other allegations in the SAC suggesting that the 2015 performance evaluation, on its own or in combination with its consequences, constituted a "sufficiently significant," *Davis*, 804 F.3d at 235, adverse action to support a *prima facie* case.

*Removal from hiring committee and hiring process*: The SAC next alleges that Stanley was removed from a "key role[]" as a hiring committee member and excluded from the hiring process for six employees whom he directly supervised. *See* SAC ¶¶ 66–68, 70. It also alleges that supervision of maintenance employees hired after 2015 was shifted to Stewart from Stanley whereas, by title, he was their supervisor. *Id.* ¶¶ 69–70, 73.

Stanley's removal from the hiring process and loss of supervisory authority over his direct reports likely—or at least plausibly—constitute materially adverse employment actions, although the SAC regrettably lacks specific allegations about the impact of these actions. However, the SAC, crucially, does not plausibly allege that, "'but for' [his] disability, the[se] adverse action[s] would not have been taken," *Natofsky*, 921 F.3d at 347. It declares that "harassment, sabotage, write ups and negative work appraisals directly led" to his removal from the hiring committee. SAC ¶ 66. But the SAC is purely conclusory that these actions or his removal from the committee were motivated by discrimination; as such, they do not make a discrimination claim plausible. And, as noted, although "temporal proximity can give rise to an inference of discrimination under certain circumstances," *E.E.O.C. v. Bloomberg*, 967 F. Supp.

2d 816, 855 (S.D.N.Y. 2013), the SAC does not allege when Stanley was removed.  That by

2015 he was no longer participating in hiring employees, *see* SAC ¶ 70, makes it possible that he

had been removed some time earlier, potentially before his kidney transplant in February 2014 or

before or during his ensuing six-month defendant-approved leave, *see id.* ¶¶ 22, 28.  Absent such

particulars, "the timing of the events . . . is not suspicious enough alone" to give rise to an

inference of discriminatory intent, *Bloomberg*, 967 F. Supp. 2d at 855.  The SAC otherwise does

not supply a basis on which to non-speculatively infer that CUNY excluded Stanley from the

hiring process "because of" his disability, *Natofsky*, 921 F.3d at 351.

   ***2017–2018 destruction of work orders, change in job description, and restriction of***

***overtime compensation***: The SAC alleges that sometime in 2017–2018, defendants began to

"destroy" Stanley's work orders, directed staff to not submit his orders, and changed his job

description to include the supervision of electricians and carpenters.  *See* SAC ¶¶ 58–62.  He also

states that, sometime after he filed his SDHR complaint in July 2017, he was told he would no

longer be compensated for "standby overtime."  *See id.* ¶¶ 117–18.  These allegations also do not

state a claim for discrimination.

   "Courts in the Second Circuit have held that reductions in workload or inferior or less

desirable assignments can constitute adverse employment actions where they impact a plaintiff's

opportunity for professional growth and career advancement." *Pierre*, 958 F. Supp. 2d at 477–

78 (citation omitted).  "However, absent such detrimental effects, courts have generally found

that merely undesirable work assignments do not constitute adverse employment actions." *Id.*

(citing cases).  For an action to be adverse action, the conduct at issue "must be more disruptive

than . . . an alteration of job responsibilities." *Davis*, 804 F.3d at 235 (citation omitted).

Although such is vaguely pled, the Court assumes *arguendo* that Stanley's inability any longer to earn pay for certain overtime work changed a feature of his employment that he had come to expect. The Court similarly assumes, as to defendants' actions related to work orders and the job description, that these inhibited Stanley's ability to perform his job, fostered negative perceptions of him in the workplace, and limited his ability to pursue certain posts, although such is thinly or, at best, implicitly pled. That said, the SAC is conspicuously devoid of allegations—beyond its use of general labels such as "harassment" and "sabotage," *see* SAC ¶ 66—that such steps actually detrimentally harmed Stanley's professional trajectory or disrupted his work. On the contrary, viewed holistically, the change in his job description appears to have broadened, rather than limited, his scope of responsibility.

But even if some or all of these actions were held to qualify as adverse employment actions, Stanley's discrimination claim would still fail because the SAC does not adequately allege that his disability was the "but-for" cause of them. *Cf. Natofsky*, 921 F.3d at 350–52 (finding plaintiff's disability not to have been a but-for cause of his demotion or negative performance review where, *inter alia*, plaintiff did not connect defendants' conduct to his disability). And, as with the SAC's allegations about the hiring process, the SAC's silence or indistinctiveness as to the timing of events precludes any causal inference based on the temporal proximity of events. *Cf. Wein*, 2020 WL 4903997, at *13 (finding insufficient evidence of discrimination where most alleged adverse actions took place at least 15 months after defendants became aware of plaintiff's disability). These actions, too, therefore do not, as pled, support a plausible *prima facie* discrimination claim.

***July 2017 negative write-up***: In two paragraphs, the SAC alleges that Stanley was the subject of a write-up that "falsely blamed" him for the discharge of an employee under his

supervision. SAC ¶ 101. Although the SAC states that this write-up "prompted" Stanley to file a discrimination complaint with the SDHR, *id.* ¶ 102, it does not set out any facts on which to infer that the write-up either changed the terms and conditions of Stanley's employment or was issued "because of" his disability, *Natofsky*, 921 F.3d at 351. The statement that defendants "issued the write up itself for discriminatory . . . reasons," SAC ¶ 114, fails as conclusory. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (*prima facie* case of discrimination cannot "rel[y] on unsupported assertions").

*September 2017 request for relocation*: In the SAC's most memorable and disturbing allegations, it alleges that a construction project conducted in Stanley's work area emitted toxic substances and created an environment "potentially life threatening" for a person with his medical condition. SAC ¶ 84. It alleges that, although various CUNY officials agreed that Stanley's working conditions were dangerous, defendants disdained his request and did not relocate him. *See generally id.* ¶¶ 86–100.

Although the SAC pleads insensitivity to the health hazards (and disruption) that the construction project posed to Stanley, it does not plausibly plead a causal connection between his disability and defendants' actions of either ordering the construction work or failing to relocate him. The decisive element is whether, "'but for' [Stanley's] disability, the adverse action would not have been taken." *Natofsky*, 921 F.3d at 347. And as to the impetus behind defendants' actions, the SAC does not plead facts making plausible the inference that CUNY undertook the construction work or chose not to relocate Stanley "because of" his disability, *id.* If anything, that CUNY implemented a "makeshift solution" during the construction project, SAC ¶ 100—even though it proved inadequate—would appear to undercut any inference of discriminatory intent.

25

***October 2018 negative work appraisal***: The SAC next alleges that defendants issued a "very biased negative work appraisal" in October 2018 that contained falsehoods about whether Stanley had completed certain projects and ordered particular equipment. *See id.* ¶¶ 104–06, 109. As noted above, "a negative performance review, without any showing of a negative ramification, cannot constitute an adverse employment action." *Natofsky*, 921 F.3d at 352. As with the 2015 evaluation, the SAC does not plausibly allege that this appraisal either rose to the level of an adverse employment action or was undertaken *because of* his disability. The assertion that Stanley was "passed over for various positions" based on this evaluation and write-ups against him is conclusory and non-specific. *See* SAC ¶¶ 110, 114. And even it were read to adequately plead repercussions for Stanley sufficient to support a claim of an adverse action, the SAC does not plausibly allege that defendants issued the false and unfair appraisal because of Stanley's alleged disability, as opposed to, for example, personal dislike of Stanley. The SAC lacks any allegations supporting that his disability figured at all in the content or timing of the appraisal.

***March 2019 denial of interview***: The SAC alleges that Stanley was "passed over for various positions for which he was qualified, in favor of non-disabled individuals, and/or in favor of individuals who had not engaged in protected activities or taken medical leaves of absence." *Id.* ¶ 110. It alleges that he was "not interviewed for" an administrative superintendent position "ostensibly because he was ineligible for the promotion due to the negative disciplinary write up"—presumably the July 2017 write-up—that had been "issued . . . for discriminatory and retaliatory reasons." *Id.* ¶ 114. For similar reasons as above, this pleading fails to support a viable Rehabilitation Act claim. It does not allege that defendants' decision not to interview and promote him was a "materially adverse change in the terms and conditions of his employment,"

*Pierre*, 958 F. Supp. 2d at 477.  The SAC does not, for example, plead facts suggesting that Stanley was entitled to be considered for or to be appointed to any open position, including the lone one it identifies, as an administrative superintendent.  Further, the SAC lacks concrete particulars as to the reasons Stanley was not promoted to these posts, but instead only speculates about the "ostensibl[e]" reason for these, *see* SAC ¶ 114.  This pleading thus does not plausibly support the inference that Stanley's disability was a but-for cause of his not gaining these posts. *Cf. McManamon v. Shinseki*, No. 11 Civ. 7610 (PAE), 2013 WL 3466863, at *10 (S.D.N.Y. July 10, 2013) (dismissing Rehabilitation Act claim where complaint did not plead sufficient facts to give rise to inference that defendants did not hire him because of disability).

    ***July 2020–September 2021 denial of remote work***:  The SAC contains allegations as to defendants' conduct after the onset of the COVID-19 pandemic.  These include that CUNY did not timely respond to his request to work remotely, SAC ¶¶ 125–26, 129, 137–39; "forced" him to work in person, *id.* ¶ 130; and denied his remote-work request, *id.* ¶ 145.

    These allegations also fail to plausibly state a *prima facie* discrimination claim.  It is well pled that the COVID-19 pandemic posed a grave risk to Stanley given his disabilities.  *See, e.g.*, *id.* ¶¶ 121, 136, 140–41.  But a discrimination claim requires more to satisfy Rule 12(b)(6).  The SAC does not plead facts that plausibly suggest that CUNY's delayed handling and ultimate resolution of his remote-work request were undertaken *because of* Stanley's alleged disability, as opposed to, for example, any number of workplace considerations during the early pandemic. *Cf. Natofsky*, 921 F.3d at 350–52 (finding discrimination allegations insufficient where plaintiff did not connect defendants' conduct to his disability).  Quite the contrary, the facts pled support a different inference: that CUNY was attempting to accommodate Stanley's needs while adapting to an unprecedented public health crisis.  These included defendants' alleged proposal

that Stanley work remotely on a "trial basis," SAC ¶ 127; HR's instruction, after Stanley sent another letter from his physician, that he work remotely, *id.* ¶ 142; and HR's imposition of mask-wearing and social-distancing requirements, *id.* ¶ 147. The SAC's allegations about other CUNY employees who were permitted to work remotely, *see id.* ¶¶ 149–50, are too sparse in context and timing to support the inference that CUNY's handling of his remote-work request was animated by his disability.

The Court accordingly dismisses the SAC's Rehabilitation Act claims of discrimination.

### 2.    Retaliation Claim

The Rehabilitation Act also prohibits retaliation against a person for opposing any practice made unlawful by the Act. Such claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); *Jackson*, 768 F. App'x at 18. At the first step, the plaintiff bears the burden of making out a *prima facie* case of retaliation. *Treglia*, 313 F.3d at 719. To do so, he must establish that (1) he engaged in an activity protected by the Rehabilitation Act; (2) the employer was aware of that activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity. *See Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002); *Natofsky*, 921 F.3d at 353.

As to the first element, a protected activity is any "action taken to protest or oppose statutorily prohibited discrimination." *Natofsky*, 921 F.3d at 354 (citation omitted). A plaintiff may not base a retaliation claim on activities that did not give "any specific indication that [he] was protesting discrimination," such as challenging a negative performance review on grounds unrelated to the plaintiff's disability. *Id.* "While it is unnecessary for an individual to specifically invoke the word discrimination when complaining in order to alert her employer to her protected activity, there must be some basis to conclude that the employer was aware that the

28

plaintiff engaged in protected activity." *Lucio v. N.Y.C. Dep't of Educ.*, 575 F. App'x 3, 6 (2d Cir. 2014) (summary order).

For an action to constitute an adverse employment action, an employee must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe. Ry. Co*, 548 U.S. at 68 (citation omitted). "This standard is broader than the adverse employment action requirement in the . . . discrimination context, because the action in question need not affect the terms and conditions of employment in order to be considered adverse." *White v. Dep't of Corr. Servs.*, 814 F. Supp. 2d 374, 388 (S.D.N.Y. 2011); *cf. Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (stating that Title VII anti-retaliation provision is broader than anti-discrimination provision, yet does not amount to "civility code" and requires consideration of perspective of reasonable employee).  In this District, actions such as performance evaluations and disciplinary letters have been held to meet this standard. *See, e.g., United States v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 365, 407 (S.D.N.Y. 2018); *Saber v. N.Y. State Dep't of Fin. Servs.*, No. 15 Civ. 5944 (LGS), 2018 WL 3491695, at *7 (S.D.N.Y. July 20, 2018).

As to the fourth element, "[a] causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky*, 921 F.3d at 353 (citation omitted); *see also, e.g., Hicks*, 593 F.3d at 170; *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006).  A plaintiff who seeks to establish this element of a *prima*

*facie* case on temporal proximity alone must "show[] that the protected activity was closely followed in time by the adverse [employment] action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (second alteration in original) (citation omitted). Although the Second Circuit has not set out a "bright line" rule for when an allegedly retaliatory action occurs too far in time from a protected activity to be considered causally connected, *id.*, "the intervening period must be very close," *Sussle*, 269 F. Supp. 2d at 316 (citation omitted). Generally speaking, recent case law suggests that a period no longer than two months permits an inference of causal connection. *See, e.g., Smith*, 440 F. Supp. 3d at 343 (collecting cases, and finding gap of three months insufficient); *McManamon*, 2013 WL 3466863, at *12 (citing cases); *see also, e.g., Natofsky*, 921 F.3d at 353 (period of several months or almost a year too long); *White*, 814 F. Supp. 2d at 390 (period of approximately one month sufficiently short).

"[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate." *Hicks*, 593 F.3d at 165. "A plaintiff's burden at this prima facie stage is *de minimis*." *Treglia*, 313 F.3d at 719. But a complaint that makes only "vague, conclusory" statements that the defendant retaliated against the plaintiff and does not supply factual detail describing the retaliatory acts, when they occurred, and which employees were aware of any protected activity or actually involved in retaliatory conduct cannot withstand a motion to dismiss. *See Saidin v. N.Y.C. Dep't of Educ.*, 498 F. Supp. 2d 683, 688 (S.D.N.Y. 2007).

Considered "both separately and in the aggregate," *Hicks*, 593 F.3d at 165, the alleged acts of retaliation in the SAC fall short of pleading a *prima facie* case of retaliation. Although the SAC does not specify which protected activities form the basis of its retaliation claim, the

Court construes the SAC to complain of retaliation from three protected activities by Stanley: (1) taking six months of disability leave after his February 2014 kidney transplant, presumably until August 2014, *see* SAC ¶¶ 22, 24, 28; (2) filing the SDHR complaint in July 2017, *see id.* ¶ 102[7]; and (3) filing this lawsuit in May 2018, *see id.* ¶ 103.[8]

At the threshold, the Court treats certain aspects of the SAC's retaliation claims to be adequately pled despite its inexact pleadings as to them. As to Stanley's disability leave, the SAC does not expressly allege that defendants were aware of that activity. But, drawing reasonable inferences in Stanley's favor, *see Koch*, 699 F.3d at 145, the Court assumes such awareness given the duration of the leave and the nature of the alleged disability. Likewise, as to Stanley's having filed the SDHR complaint and this lawsuit, the SAC does not allege whether— and which—defendants were aware of these protected activities. Nonetheless, construing all

---

[7] Stanley did not attach the SDHR complaint to the SAC. Based on the SAC's description of it, the Court assumes that it constituted protected activity in protest of discrimination. *See, e.g., Kessler*, 461 F.3d at 210 (SHDR complaint is protected activity); *Zoulas v. N.Y.C. Dep't of Educ.*, 400 F. Supp. 3d 25, 57 (S.D.N.Y. 2019) (same).

[8] The Court does not consider Stanley's September 2017 email to defendants complaining of the toxic substances emitted from the construction project in his work area to be a protected activity. As alleged, Stanley complained there "of being required to continue working in an area where construction work was happening and that he was being covered in dust and steel particles that was compromising his health." SAC ¶ 83. Although Stanley's alleged disability and resulting "compromised immunity," *id.* ¶ 84, were a basis for his complaint, the complaint was not an "action taken to protest or oppose statutorily prohibited discrimination" and did not give a "specific indication that [he] was protesting discrimination," *Natofsky*, 921 F.3d at 354 (citation omitted). In other words, Stanley's email complained about his working conditions, in the context of his alleged disability, rather than complaining about discrimination based on the disability. Stanley does not allege that he took any other action complaining about the construction project as an alleged act of discrimination.

To the extent the SAC alleges that Stanley took "intermittent" medical leave, SAC ¶ 33, during the period it covered, the Court does not consider such leave, as pled, to constitute an additional protected activity because the SAC is unspecific as to the nature and basis of this leave.

facts in Stanley's favor as required on a motion to dismiss, the Court considers all timely alleged acts of retaliation to each protected activity.

The Court, however, finds, for the following reasons, that the SAC—the bulk of whose allegations of retaliation are conclusory and unconnected to any particular protected activity, *see, e.g.*, SAC ¶¶ 32, 35, 102, 110, 158—does not allege a plausible claim of retaliation. *See Hicks*, 593 F.3d at 167 (affirming dismissal of retaliation claims that "lack specifics and are conclusory"); *McManamon*, 2013 WL 3466863, at *12 (dismissing Rehabilitation Act retaliation claim where complaint provided only "bare assertions of retaliation" and alleged retaliation more than two months after protected activity).

***Retaliation for taking disability leave after kidney transplant***:  The SAC lacks actionable allegations of retaliation against Stanley for taking disability leave after his kidney transplant.  Phelon's expression on "many occasions" of "frustration" to other CUNY managers about Stanley's medical conditions and his need for intermittent medical leave, *see* SAC ¶ 33— although well-pled to have been prompted by Stanley's having taking leave—does not rise to the level of a materially adverse employment action. *See Pierre*, 958 F. Supp. 2d at 483 ("[A]ctions that are trivial harms—*i.e.*, those petty slights or minor annoyances that often take place at work and that all employees experience—are not materially adverse." (quoting *Tepperwien v. Entergy Nuclear Ops., Inc.*, 663 F.3d 556, 571 (2d Cir. 2011)) (cleaned up)).  The SAC permits the inference that Phelon was frustrated by Stanley's need for leave, but not that he was driven by "retaliatory animus directed against [Stanley]," *Natofsky*, 921 F.3d at 353 (citation omitted).

As for the allegation that Phelon instructed another CUNY employee to review Stanley's medical records in 2015, *see* SAC ¶ 34, it is not pled to have been caused by Stanley's taking of medical leave.  Such a review could qualify as a materially adverse action given the privacy of

one's medical records. But the SAC's sparse allegations do not permit, non-speculatively, the inference that the review was driven by retaliatory intent, as opposed to, for example, frustration, skepticism, or curiosity. And, critically, there is no temporal basis to infer causation, because, as pled, the review of Stanley's records took place at least more than four months after the point at which Stanley's medical leave ended. *See Gorman-Bakos*, 252 F.3d at 554.

The allegation that Stanley received a "very biased and negative" performance evaluation from defendants for the 2015 year, *see* SAC ¶ 40, comes closest to plausibly alleging retaliation for Stanley's having taken leave. Insofar as the evaluation "made express reference" to Stanley's "excessive absences for poor health," *id.* ¶ 41, the SAC pleads a causal connection between his protected activity and the negative evaluation. But the SAC's skimpy factual allegations about the negative evaluation do not adequately allege that it rose to the level of a materially adverse employment action. Beyond broadly casting the evaluation as "very biased and negative," *id.* ¶ 40, the SAC is silent as to what the evaluation discussed and what actions, if any, it recommended. In this District, "[n]egative evaluations may be considered adverse where the evaluation negatively impacted plaintiff's employment," such as an evaluation "recommending [plaintiff's] termination." *N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d at 407; *see also White*, 814 F. Supp. 2d at 388 ("[M]any" cases holding "that a notice of discipline does not constitute an adverse action in the retaliation context" have "relied on the fact that the plaintiff did not point to any negative consequences arising from the notice."). Here, however, the SAC lacks specific, nonconclusory allegations that this evaluation negatively impacted Stanley's employment. As reviewed above, the SAC does not, for example, plausibly allege that the evaluation caused Stanley to be excluded from the hiring process and passed over for various positions.

The remaining alleged adverse actions—including Stanley's exclusion from the hiring process, defendants' destruction of his work orders and change in his job description, and the July 2017 write-up—are also not pled as retaliation for Stanley's having taken disability leave. The Court assumes each to have been materially adverse for the purposes of stating a retaliation claim. But as to none individually are facts pled that plausibly connect the action to Stanley's leave. Viewing them in the aggregate, *Hicks*, 593 F.3d at 165, does not salvage this claim, either. Given the long timespan covered by the allegedly retaliatory conduct and the lack of plausibly pled connection between any alleged action and Stanley's leave, only by speculation can an inference of retaliation arise. *Compare Smith*, 440 F. Supp. 3d at 342–43 (no *prima facie* case of retaliation where "several inferences" required to conclude that statements about, *inter alia*, EEOC complaint and organizational structure were retaliatory, and temporal proximity of alleged statements and protected activities, ranging from three months to more than two years, was "insufficient to yield an inference of causal connection"), *with Pistello v. Bd. of Educ. of Canasota Cent. Sch. Dist.*, 808 F. App'x 19, 22 (2d Cir. 2020) (sustaining retaliation claim where plaintiff "received multiple disciplinary reprimands," was summoned to multiple conduct meetings, and was subject of purportedly inaccurate report in six-month period after protected activity).

***Retaliation for filing SDHR complaint***: The SAC alleges that a negative write-up prompted Stanley to file his SDHR complaint in July 2017, SAC ¶ 102, but it does not contain allegations plausibly alleging that he was then retaliated against for doing so. As to the steps defendants allegedly took with respect to Stanley's work orders and job description, *see id.* ¶¶ 58–62, the SAC does not plead facts (for example, statements or writings by participants) suggesting that these were driven by animus from the SDHR complaint's filing. Nor does the

34

SAC permit an inference of temporal causation. The SAC broadly and blurrily alleges that these actions took place in the 2017–2018 time period, but it does not allege that any occurred within the several months after the SDHR complaint was filed.

The construction project that began on September 25, 2017, *see id.* ¶ 74, is pled more closely in time—its initiation followed the SDHR complaint by some two months, placing it at the outer bound of the timeframes from which temporal inferences of causation have been committed. *See Smith*, 440 F. Supp. 3d at 343. But the facts pled about the project make it implausible that this expensive and extensive project was initiated to retaliate against Stanley for filing an SDHR complaint. As pled, the project was undertaken to enable the installation of a "disabled access lift" in the building, which required the installation of support beams to secure the floor. *Id.* ¶ 74. The SAC does not allege—and the inference, without more, would be highly improbable—that the decisions to undertake a complex project of this scale and nature, and where to situate the support beams for it, were first made in the two months immediately preceding the initiation of construction. And the SAC alleges that Stanley was first relocated to the basement storage area in November 2013, many months before any alleged protected activity. Without more, this theory of retaliation is not plausibly pled. *See, e.g.*, *Natofsky*, 921 F.3d at 354 (affirming dismissal of retaliation claim where plaintiff's "demotion could not have been in retaliation for his appeal of [defendant's] performance review," as the "decision to reorganize the department and demote [plaintiff] was made . . . in advance of [] performance review and [plaintiff's] decision to appeal").

The SAC also characterizes Stanley's October 2018 work appraisal as "retaliatory," SAC ¶ 107. To the extent this implies retaliation for the SDHR complaint that Stanley had filed more than 14 months earlier, the causal inference is not pled. *See Natofsky*, 921 F.3d at 353

35

(retaliation claim based on negative performance review implausibly pled where plaintiff's protected activity of complaining about defendant occurred nearly one year before). Stanley's having been "passed over" for various posts "in favor of individuals who had not engaged in protected activities," SAC ¶ 110, including for a promotion in March 2019, likewise occurred too remotely in time for an inference of retaliatory motivation to arise. Finally, the SAC alleges in a sentence that, "[a]fter filing a complaint with the New York State Division of Human Rights," Stanley was informed that he would no longer be compensated for standby overtime. *Id.* ¶ 118. Although this statement purports to supply direct evidence of retaliatory causation, it does not plausibly do so. It does not say who made this statement, whether it was made by a person with knowledge of the reasons why Stanley henceforth would be ineligible for standby overtime, or when it was made. *See, e.g.*, *Hicks*, 593 F.3d at 167–68 (affirming dismissal of retaliation claims that, *inter alia*, "fail[ed] to offer evidence as to which employees [committed retaliatory action]," leaving purely to speculation whether [defendant] was responsible" and did not "explain[] whether [defendant] started calling [plaintiff] 'Hick' before [plaintiff] had cooperated in . . . investigation"). This allegation thus is far short of those on which courts have sustained claims of retaliation based on statements and actions from which such an inference logically arose. *See, e.g.*, *Treglia*, 313 F.3d at 717, 720 (plaintiff stated *prima facie* case of retaliation where "many of the alleged adverse employment actions took place within a few months" of protected activity, and alleged actions included failing to promote plaintiff to position for which plaintiff was "next in line," formally investigating plaintiff, involuntarily transferring him, and issuing negative work evaluation inconsistent with prior evaluations).

*Retaliation for filing suit in this Court*: As with the SDHR complaint, the SAC alleges that Stanley's initiation of this lawsuit in May 2018 "triggered more reprisals." SAC ¶ 103. But,

36

for the reasons above, the SAC only conclusorily alleges that any action thereafter—including the negative work appraisal in October 2018, the decision to not promote him in March 2019, and various actions after the onset of the COVID-19 pandemic—was caused by this filing.

The Court accordingly dismisses the SAC's Rehabilitation Act claims of retaliation.

### 3.    Hostile Work Environment Claim

To prevail on a hostile work environment claim under federal law, a plaintiff must show that "a workplace is so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered." *Knope v. Garland*, No. 20-3274, 2021 WL 5183536, at *4 (2d Cir. Nov. 9, 2021) (quoting *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013)); *see also Lucenti v. Potter*, 432 F. Supp. 2d 347, 361 (S.D.N.Y. 2006). A plaintiff must further demonstrate "that a specific basis exists for imputing the objectionable conduct to the employer," *Fox*, 918 F.3d at 74 (internal quotation marks omitted), and "that the employer created a hostile environment because of a protected characteristic," *Knope*, 2021 WL 5183536, at *4.

"This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive," but "a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citation omitted). In evaluating hostile work environment claims, a court looks to "the totality of the circumstances," including "proof of the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether

it unreasonably interfered with the plaintiff's work performance." *Fox*, 918 F.3d at 74 (citation omitted).

Here, the SAC alleges that defendants "harass[ed]," "scrutiniz[ed]," and "berate[d]" Stanley based on his disability and asserted need for leave.  SAC ¶ 57.  It claims that defendants, *inter alia*, expressed frustration about him to other managers, *id.* ¶ 33, reviewed his medical records without his authorization, *id.* ¶ 34, issued biased and false performance evaluations and write-ups, *id.* ¶¶ 36, 101, 104, directed other employees not to submit his work orders, *id.* ¶¶ 59–60, excluded him from the hiring process, *id.* ¶ 66, failed to relocate him during construction work, *id.* ¶ 89, "threatened" him, *id.* ¶ 92, did not interview him for a position for which he was qualified, *id.* ¶¶ 111, 114, rescinded his overtime compensation, *id.* ¶ 118, and failed to timely respond to his request for a COVID-19 accommodation, *id.* ¶ 137.

The alleged conduct does not make out a hostile work environment claim under the Rehabilitation Act.  First, crucially, the SAC does not allege, save non-conclusorily so, any connection between most of this conduct and Stanley's "protected characteristic," *Knope*, 2021 WL 5183536, at *4.  For example, the allegations in the SAC fail to permit any plausible inference of a connection between Stanley's alleged disability and his removal from the hiring committee, *see* SAC ¶¶ 66–73, the July 2017 write-up that "falsely blamed" him for the discharge of an employee, *see id.* ¶ 101, the denial of his request for relocation during construction work, *id.* ¶¶ 83–100, the destruction of his work orders or change in his job description, *id.* ¶¶ 58–62, the October 2018 negative work appraisal, *id.* ¶¶ 104–09, him being passed over for a promotion, *id.* ¶¶ 111–14, or the untimely response to and denial of his remote-work request, *see id.* ¶¶ 125–46.  And any allegations that these actions constituted discriminatory conduct are largely conclusory.  *See, e.g.*, *id.* ¶ 66 (stating that "harassment,

sabotage, write ups and negative work appraisals directly led" to removal from hiring committee); *id.* ¶ 114 (stating he was not interviewed "ostensibly because he was ineligible for the promotion due to the negative disciplinary write up").  As pled, such conduct could equally if not more plausibly stem from other sources, including supervisors' and coworkers' dislike of Stanley unconnected to his disability.  Therefore, even attributing all the alleged conduct to CUNY, the defendant on the Rehabilitation Act claims, the conduct not plausibly tied to Stanley's disability must be set aside on the hostile work environment claim.  *Cf. Lucenti*, 432 F. Supp. 2d at 377 (removing "from consideration" of hostile work environment claim allegations that "support an inference that [plaintiff] was mistreated," but "do not support an inference that this was because of her sex").  With such conduct removed from the equation, the SAC falls short of alleging conduct that meets the standard set by federal law for such a claim: conduct so "severe or pervasive" that "a reasonable person would find it hostile or abusive," *Raspardo*, 770 F.3d at 114.  The conduct alleged that is plausibly linked to Stanley's disability does not rise to the level of "alter[ing]," *Knope*, 2021 WL 5183536, at *4, the terms and conditions of his employment.  *See, e.g.*, *Pierre*, 958 F. Supp. 2d at 487 (making comments outside plaintiff's presence, passing plaintiff over for promotion, and requiring submission of doctor's notes to grant sick leave not "so objectively severe or pervasive to alter the conditions of his employment" (brackets and citation omitted)); *Lucenti*, 432 F. Supp. 2d at 363 (write-ups, reprimands, and following plaintiff to bathroom "did not materially alter [plaintiff's] working conditions").  That the acts alleged—save the expression of frustration about Stanley—occurred at discrete points over a span of more than five years is also problematic, insofar as acts must be "sufficiently continuous and concerted," *Alfano*, 294 F.3d at 374 (citation omitted), to constitute a hostile work environment.

The Court accordingly, mindful of case authority dismissing claims involving alleged conduct of similar or greater severity, dismisses the SAC's hostile work environment claim under the Rehabilitation Act. *See, e.g., Knope*, 2021 WL 5183536, at *4 (affirming dismissal of hostile work environment claim based on "sporadic" conflicts over four years about work responsibilities); *Harewood v. N.Y.C. Dep't of Educ.*, No. 18 Civ. 5487 (KPF), 2021 WL 673476, at *13 (S.D.N.Y. Feb. 22, 2021) (negative performance reviews, disciplinary letters, and changes to lunch period insufficient to sustain hostile work environment claim).

### 4.  **Failure-to-Accommodate Claim**[9]

The SAC's claim of the denial of a reasonable accommodation appears to relate to CUNY's allegedly untimely response to and denial of his request to work remotely after the onset of the COVID-19 pandemic.[10] *See* SAC ¶¶ 126–31, 135–47.

"To establish a *prima facie* case of discrimination based on an employer's failure to accommodate a disability, under either the ADA or the Rehabilitation Act, a plaintiff must demonstrate that (1) [he] is a person with a disability under the meaning of [the statute in question]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the

---

[9] Defendants argue that Stanley failed to exhaust his administrative remedies before filing his failure-to-accommodate and failure-to-promote claims. Mot. at 17–18. That is wrong. In this Circuit, the Rehabilitation Act requires the exhaustion of administrative remedies only in cases brought by federal employees, not by those, like Stanley, who work for federally funded employers. *See Costabile v. N.Y.C. Health & Hosps. Corp.*, 951 F.3d 77, 81–82 (2d Cir. 2020) ("[W]e have never held that a Rehabilitation Act claim against a non-federal employer is subject to an administrative exhaustion requirement, nor is there any statutory basis for imposing one."); *see also Mary Jo C. v. N.Y. State & Loc. Ret. Sys.*, 707 F.3d 144, 170 n.11 (2d Cir. 2013).

[10] The Court does not consider in this analysis defendants' alleged failure to relocate Stanley during the construction project in his work area beginning in September 2017. *See* SAC ¶ 82. Neither the SAC nor Stanley's opposition brief raises a failure-to-accommodate claim with respect to this alleged conduct. *See* Opp. at 16–17 (noting failure-to-accommodate claim includes denial of remote-work request, but not mentioning other grounds for claim).

employer has refused to make such accommodations." *Natofsky*, 921 F.3d at 352 (citation omitted); *see also Laguerre v. Nat'l Grid USA*, No. 20-3901, 2022 WL 728819, at *1 (2d Cir. Mar. 11, 2022).

The Rehabilitation Act "contemplates that employers will engage in an interactive process with their employees and in that way work together to assess whether an employee's disability can be reasonably accommodated." *Perkins v. City of New York*, No. 22-196, 2023 WL 370906, at *3 (2d Cir. Jan. 24, 2023) (citation omitted). "[A] refusal of a request for a reasonable accommodation can be both actual or constructive, as an indeterminate delay has the same effect as an outright denial." *Id.* (citation omitted). Yet "[a] reasonable accommodation can never involve the elimination of an essential function of a job." *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003). And "an employee may not recover based on his employer's failure to engage in an interactive process if he cannot show that a reasonable accommodation existed at the time of his dismissal." *McElwee v. County of Orange*, 700 F.3d 635, 642 (2d Cir. 2012).

The SAC has adequately alleged both that Stanley is a person with a disability and that defendants were on notice of his disability. But it does not plausibly allege facts sufficient to make out the third and fourth prongs of a failure-to-accommodate claim. As to the third, the SAC provides an insufficient basis on which to conclude that the requested accommodation— working remotely, indefinitely—would have permitted him to "perform the essential functions of his employment," *McMillan*, 711 F.3d at 126 (citation omitted). It alleges that, as of September 2021, Stanley had "satisfactorily perform[ed] all his essential duties remotely and without issue for at least 14 months." SAC ¶ 148. But that period is largely coterminous with the first phase of the pandemic. The SAC does not address whether CUNY's needs and Stanley's

responsibilities after the initial phase of the pandemic, when he had worked remotely, tracked

those thereafter. The SAC is devoid of factual averments supporting the conclusory allegation

that Stanley—whom the SAC describes a maintenance and labor supervisor—could entirely

perform his duties in that role remotely as the university, presumably around September 2021,

emerged from the pandemic and resumed more in-person classes and activities. More is needed

to make plausible the allegation that Stanley could have performed all his essential duties from

home. *Compare Smith v. Town of Ramapo*, 745 F. App'x 424, 426 (2d Cir. 2018) (affirming

dismissal of reasonable accommodation claim where complaint did not "plead that following

[plaintiff's] injury he could have performed the essential duties of a police officer, either with or

without a reasonable accommodation"), *with Coleman v. N.Y.C. Dep't of Health & Mental

Hygiene*, No. 20 Civ. 10503 (DLC), 2022 WL 704304, at \*4 (S.D.N.Y. Mar. 9, 2022) (upholding

claim where plaintiff "sufficiently ple[d] that he was able to perform essential aspects of his role,

for instance performing wellness checks, while working remotely," "emphasiz[ed] that the

essential functions of the job could be completed from home," and pled that, "at the time he

sought an accommodation, there were two vacant positions to which he could have been

reassigned"). The SAC, in fact, alleges the contrary: that HR denied his remote-work request on

the grounds that the "essential functions" of his position "cannot be performed remotely" and

reassigning those functions would pose "undue hardship." SAC ¶¶ 145–46. The SAC does not

concretely allege why such was not so.

The SAC does allege that two other managers—the director of the accessibility resource

lab and testing, and the health services and emergency funding director—were permitted to work

remotely. *See id.* ¶¶ 149–50. But the SAC does not plead that the functions of these managers

were comparable to Stanley's as a maintenance and labor supervisor—or that these persons had

been granted leave to work remotely on a permanent basis.  The SAC therefore does not

plausibly plead that, at the time CUNY denied Stanley's request to work remotely indefinitely,

this request was a reasonable accommodation pursuant to which he could have performed the

essential functions of his job.  *Cf., e.g., McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583

F.3d 92, 99 (2d Cir. 2009) (affirming dismissal where no evidence that accommodation existed

"at or about the time of her termination"); *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL

1133010, at *4 (2d Cir. Apr. 18, 2022) (affirming dismissal where no showing that

accommodation of light-duty position would enable plaintiff to perform essential functions of

job, or that position was requested or available).

      For much the same reasons, the SAC does not adequately plead facts to support the fourth

prong.  The SAC alleges that defendants "refused to engage in an interactive process," SAC

¶ 131, took several months to address his request, *see id.* ¶¶ 126, 139, and ultimately denied his

request, *id.* ¶ 145.  But it must adequately plead "that a reasonable accommodation existed at the

time of his dismissal," *McElwee*, 700 F.3d at 642, and given the SAC's failure to analyze the

nature of Stanley's responsibilities from September 2021 forward, it by definition cannot (and

does not) so plead.  To the contrary, the SAC states that CUNY provided forms of

accommodations, including a proposal, rejected by Stanley, that he work remotely on a "trial

basis," SAC ¶¶ 126–27, and, when it required Stanley to report to work in person, social-

distancing and mask-wearing requirements to protect him, *id.* ¶ 147.  The SAC does not allege

why these accommodations were less than reasonable.

### 5.  Failure-to-Promote Claim

      The SAC also alleges that Stanley was "passed over for various positions for which he

was qualified." *Id.* ¶ 110.  The Court infers that Stanley means to bring a standalone failure-to-

promote claim.  Such a claim, however, is inadequately pled.  "To establish a *prima facie* case of

discriminatory failure to promote, a plaintiff must allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion." *Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003) (quoting *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998)). Here, the SAC does not allege that Stanley applied for any position, *see id.* at 314–15 (upholding dismissal of claim where plaintiff did not allege that "he applied for specific positions"), or that he was entitled to be considered for or to be appointed to any open position. Without that, its conclusory allegations as to why he was not considered for a promotion or other positions cannot make out a *prima facie* case.

The Court thus dismisses Stanley's claims under the Rehabilitation Act.

**B.    Claims Against Individual Defendants**

At the threshold, the individual defendants argue that the SAC's claims do not relate to those in his original complaint, which brought claims against only CUNY. Thus, they argue, the only timely claims are those based on conduct within three years of the filing of the SAC on September 28, 2021. Mot. at 20–23. Seeking to measure timeliness by the May 31, 2018 filing date of the original complaint, Stanley counters that the individual defendants were on notice of the factual allegations against them based on the original complaint and at all times had a unity of interests with CUNY. Opp. at 18–19. Although the individual defendants' argument on this ground as to the untimeliness of certain claims is substantial, the Court ultimately need not resolve it, because all federal claims in the SAC against these defendants are independently deficient.

**1.    ADA Claims**

The SAC brings ADA claims of discrimination, retaliation, and denial of reasonable accommodations. SAC ¶¶ 164–66. The Court construes these as under Title I of the ADA,

44

which prohibits employment discrimination. *See Mary Jo C. v. N.Y. State & Loc. Ret. Sys.*, 707 F.3d 144, 171 (2d Cir. 2013) (ADA "unambiguously limits employment discrimination claims to Title I"). Stanley seeks "only prospective injunctive relief" under the ADA against the individual defendants, Opp. at 19; *see also* SAC ¶ 166, which Title I permits. *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 n.9 (2001); *see also Darcy v. Lippman*, 356 F. App'x 434, 436–37 (2d Cir. 2009) (Eleventh Amendment bars private individuals from suing individual defendants in their personal capacities or from seeking damages from individual defendants in their official capacities).

ADA claims against individual defendants are evaluated under the same standards as claims under the Rehabilitation Act. *See* 29 U.S.C. § 794(d); *see also supra* note 6 (citing cases). Such claims are likewise subject to a three-year limitations period. *See Purcell v. N.Y. Inst. of Tech. – Coll. of Osteopathic Med.*, 931 F.3d 59, 63 (2d Cir. 2019). Because the SAC's ADA claims are narrower than, or no broader than coextensive with, its claims under the Rehabilitation Act, these claims require dismissal, for the same reasons as did the Rehabilitation Act claims, discussed above. *See, e.g.*, *Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 267 (S.D.N.Y. 2020) (extending ruling on Rehabilitation Act claims to those against individual defendant under ADA); *Wein*, 2020 WL 4903997, at *11 (analyzing Rehabilitation Act and ADA claims together).[11]

---

[11] Separately, defendants challenge these claims, limited as they are to injunctive relief, on the grounds that Phelon and Stewart no longer work for CUNY, *see* Mot. at 5 n.6, 6 n.7, and that the SAC does not plausibly allege that Bracco or Jeffrey has the authority to prevent the alleged discrimination, *see* Reply at 7. These points are well taken and separately support dismissal of the ADA claims against individual defendants.

## 2.     FMLA Claims

The SAC next alleges that the individual defendants "intentionally violated the FMLA by interfering with, restraining and/or denying [Stanley's] attempts to exercise his rights under the FMLA" and "retaliated against [him] for his having taken FMLA-leaves." SAC ¶¶ 168–69. The Court interprets the SAC thus to bring two distinct claims under the FMLA: interference and retaliation.

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition." 29 U.S.C. § 2612(a)(1). Upon return from FMLA leave, an eligible employee is entitled "to be restored by the employer to the position of employment held by the employee when the leave commenced," or "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.* § 2614(a)(1)(A)–(B). Employers are prohibited from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided" under the FMLA. *Id.* § 2615(a)(1). And "[i]t shall be unlawful for any employer to . . . discriminate against any individual for opposing any practice made unlawful by" the FMLA. *Id.* § 2615(a)(2). Lawsuits under the FMLA must be filed within two years of the last occurrence of a violation, unless the violation was "willful," in which case the limitations period is three years. *See id.* § 2617(c).

"An individual may be held liable under the FMLA only if she is an 'employer,' which includes 'any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." *Ziccarelli v. NYU Hosps. Ctr.*, 247 F. Supp. 3d 438, 446 (S.D.N.Y. 2017) (quoting 29 U.S.C. § 2611(4)(A)(ii)(I)). "Whether an individual is an 'employer' for the purposes of the FMLA is determined by the economic reality test," under which courts ask "whether the alleged employer possessed the power to control the worker in

question." *Id.* (citation omitted). "[T]o survive a motion to dismiss, [the] Plaintiff need not allege sufficient facts to satisfy the economic reality test; instead, he must simply plead that the proposed Individual Defendants had substantial control over the aspects of employment alleged to have been violated." *Id.* The SAC, however, does not plead whether any individual defendant had the requisite substantial control over Stanley's employment. It instead suggests that some key aspects of such control rested with various HR employees not named as defendants. *See, e.g.*, SAC ¶¶ 124–27, 145 (HR handling remote-work request); *id.* ¶ 142 (HR instructing Stanley to work remotely). Nonetheless, even assuming the individual defendants' employer status, the SAC's FMLA claims of interference and retaliation fail on the merits.

"To succeed on a claim of FMLA interference, a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave [timely] notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017) (citation omitted). "[E]ven when an employee can demonstrate interference with her FMLA rights, the Act provides no relief unless the employee has been prejudiced by the violation." *Nikolakopoulos v. Macy's Inc.*, No. 20 Civ. 1641 (KPF), 2022 WL 3903595, at *24 (S.D.N.Y. Aug. 30, 2022) (citation omitted).

The Court assumes arguendo that the SAC plausibly pleads the first three prongs of the interference analysis. It fails, however, to plead that he gave CUNY notice of his intention to take FMLA leave which was then denied. *Cf. Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 194 (S.D.N.Y. 2011). To the contrary, the SAC states, at various points, that defendants granted Stanley leave under the FMLA. *See* SAC ¶¶ 22, 28, 36. The SAC does, confusingly,

allege that Stanley "was forced to use annual leave time" after HR instructed him on August 9, 2021 to work remotely, and possibly also after Fraser's notice on September 17, 2021 that CUNY had denied his request to work remotely indefinitely. *Id.* ¶¶ 143–45. It also alleges that, "[c]urrently"—as of the time of the filing of the SAC on September 28, 2021—Stanley "is on paid administrative leave." *Id.* ¶ 144. Even reading these unclear allegations in the light most favorable to Stanley, the SAC does not allege that Stanley in fact took such "annual" or "administrative" leave pursuant to the FMLA, or that his taking such leave denied him benefits. The SAC goes on to state that Stanley has been traveling to work, implying that he is no longer on leave. *See id.* ¶ 151. These muddy allegations fall well short of claiming that Stanley, at any point, gave timely notice of his intent to take FMLA leave and was thereafter denied benefits to which he was entitled under the FMLA. The SAC therefore does not plead the elements of a *prima facie* interference claim. Nor does it plead facts sufficient to make out an interference claim on a "discouragement theory." That is because the SAC does not factually allege "acts of discouragement that would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." *Betances v. MetroPlus Health Plan, Inc.*, No. 20 Civ. 2967 (JGK), 2021 WL 2853363, at *2 (S.D.N.Y. July 7, 2021) (citation omitted); *see Nikolakopoulos*, 2022 WL 3903595, at *25–26.

The SAC's claim of retaliation in violation of the FMLA also is unsustainable. Such retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Potenza v. City of New York*, 365 F.3d 165, 167–68 (2d Cir. 2004). To establish a *prima facie* case of retaliation, a plaintiff must establish that (1) he exercised rights protected under the FMLA; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of

retaliatory intent. *See id.* at 168; *Higgins*, 836 F. Supp. 2d at 194–95. As with retaliation claims

under the Rehabilitation Act and ADA, a "materially adverse action" is defined as "any action by

the employer that is likely to dissuade a reasonable worker in the plaintiff's position from

exercising his legal rights." *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011). For

the reasons stated above in connection with the SAC's retaliation claim under the Rehabilitation

Act, the SAC does not plausibly allege the third and fourth elements of his FMLA retaliation

claim: that he suffered an adverse action under circumstances giving rise to an inference of

retaliatory intent. In particular, defendants' alleged conduct does not rise to the level of a

"materially adverse action," *id.*, nor reflect an intent to retaliate against Stanley for exercising his

FMLA rights. *Cf., e.g., Nikolakopoulos*, 2022 WL 3903595, at *17 (finding FMLA retaliation

claim inadequate where plaintiff failed to show that defendants "took an adverse action against

her *because of* her protected activity").

Therefore, the Court dismisses the SAC's FMLA claims.

### 3.      NYSHRL & NYCHRL Claims

The Court considers the remaining claims, all against the individual defendants, under the

NYSHRL and NYCHRL. These are for discrimination, retaliation, hostile work environment,

and aiding and abetting CUNY. SAC ¶¶ 171–76. With the SAC's not having pled diversity

jurisdiction, *id.* ¶ 5, the sole basis on which these claims are before the Court is pursuant to its

exercise of supplemental jurisdiction insofar as these are related to the SAC's now-dismissed

federal claims.

District courts may decline to exercise supplemental jurisdiction over a claim if "the

district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C.

§ 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the

balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy,

convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citation omitted); *see, e.g.*, *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) ("[T]he district court may also decide whether to exercise supplemental jurisdiction over this claim; it may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice to refiling in state court."); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."); *One Commc'ns Corp. v. J.P. Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) (summary order) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims.").

The Court declines to exercise supplemental jurisdiction over Stanley's state-law claims. As other courts in this Circuit have noted, "the law of New York in regard to relative state and federal disability claim analysis is still developing." *Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 168 (S.D.N.Y. Sept. 30, 2020) (citation omitted), *aff'd*, Nos. 20-3624, 20-3745, 2021 WL 5986999 (2d Cir. Dec. 17, 2021). As a result, "the Court of Appeals for the Second Circuit has recommended that where there is an absence of any continuing basis for federal question jurisdiction under the ADA, the appropriate analytic framework to be applied to discrimination claims based on a disability as defined by New York state and municipal law is a question best left to the courts of the State of New York." *Brantman v. Fortistar Cap., Inc.*, No. 15 Civ. 4774 (NSR), 2017 WL 3172864, at *12 (S.D.N.Y. July 22, 2017) (collecting cases) (citation and brackets omitted); *see, e.g.*, *Klaper v. Cypress Hills Cemetery*, 593 F. App'x 89, 90 (2d Cir. 2015). And the Court does not discern any reason why, upon the pre-discovery

dismissal of these claims, any party would be consequentially inconvenienced or prejudiced by adjudicating the state-law claims in state court.

Additional statute-specific reasons favor declining to exercise supplemental jurisdiction over these claims. In this Circuit, in light of rules of construction specific to NYCHRL claims, such claims must be analyzed "separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Given the "slow development of case law regarding the appropriate standard by which to evaluate NYCHRL claims," *Bloomberg*, 967 F. Supp. 2d at 835 (discussing context of summary judgment), the separate and independent inquiry the Court would need to undertake in this "evolv[ing]" area of law, *id.* at 835 n.6, and the parties' limited briefing on the NYCHRL claims specifically, the factors of convenience, comity, and judicial economy disfavor exercising jurisdiction over Stanley's NYCHRL claims. *See, e.g., Kenny v. Catholic Charities Cmty. Servs., The Archdiocese of N.Y.*, No. 20 Civ. 3269 (PAE) (RWL), 2023 WL 1993332, at *25–26 (S.D.N.Y. Feb. 14, 2023) (declining to exercise supplemental jurisdiction over NYCHRL claims after granting summary judgment on Title VII and NYSHRL claims).

Similarly as to the NYSHRL claims, "[t]he NYSHRL was amended on August 19, 2019 to provide that its provisions should be construed liberally 'regardless of whether federal civil rights law, including those laws with provisions worded comparably to the provisions of this article, have been so construed.'" *Deveaux v. Skechers USA, Inc.*, No. 19 Civ. 9734 (DLC), 2020 WL 1812741, at *3 n.3 (S.D.N.Y. Apr. 9, 2020) (quoting amendment). In other words, the NYSHRL was amended to "render the standard for claims closer to the standard under the NYCHRL." *Wellner v. Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019). At least some of the SAC's allegations involve conduct that took

place after the amendment's effective date. There would thus appear to be a need to address the
as-yet unresolved question of whether the amended NYSHRL tracks, or merely approaches, the
more liberal standards of the NYCHRL. Courts have differed on that question. *See Johnson v.
Everyrealm, Inc.*, --- F. Supp. 3d ---, 2023 WL 2216173, at *12 (S.D.N.Y. 2023) (citing cases);
*Summit v. Equinox Holdings, Inc.*, No. 20 Civ. 4905 (PAE), 2022 WL 2872273, at *18
(S.D.N.Y. July 21, 2022). That question, too, is best left to the New York state courts to resolve.

The Court accordingly dismisses the SAC's NYSHRL and NYCHRL claims, without
prejudice to Stanley's right to pursue such claims in state court.

### C.   Motion to File a Third Amended Complaint

On March 1, 2023, Stanley sought leave to file a Third Amended Complaint ("TAC"), to
enable him to add claims of retaliatory discharge under the Rehabilitation Act, ADA, FMLA,
and NYCHRL. *See* Dkt. 134. He stated that, on February 8, 2023, CUNY had informed him
that his appointment at John Jay would be terminated as of March 9, 2023. *Id.* He stated that the
reason given for his termination—"that he refused to perform work that was assigned to him and
refused to take certain training"—was pretextual and that the termination was retaliatory. *See id.*
Defendants oppose Stanley's bid to file a Third Amended Complaint, noting the delays Stanley
had previously caused in this litigation, that such a filing would cause prejudice and further
delay, and that Stanley had not furnished a proposed third amended complaint. *See* Dkt. 135.

The Court denies Stanley's motion to file a Third Amended Complaint in this litigation.
The Court does so, however, without prejudice to Stanley's right to pursue, in a separate lawsuit,
claims arising from his recent termination, which is outside the scope of the matters litigated in
this lawsuit.

Briefly, the Supreme Court has directed courts to grant leave to amend under Federal
Rule of Civil Procedure 15, save for countervailing reasons including "undue delay," "repeated

failure to cure deficiencies by amendments previously allowed," "undue prejudice," and

"futility." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "In gauging prejudice, we consider,

among other factors, whether an amendment would require the opponent to expend significant

additional resources to conduct discovery and prepare for trial or significantly delay the

resolution of the dispute." *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008)

(citation omitted); *cf. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) ("[W]hile

Rule 15 plainly embodies a liberal amendment policy, in the post-judgment setting we must also

take into consideration the competing interest of protecting the finality of judgments and the

expeditious termination of litigation." (citation omitted)). "A proposal to amend a complaint is

futile if the proposed amended complaint would fail to state a claim on which relief could be

granted." *Higgins*, 836 F. Supp. 2d at 186 (citing cases).

Applying these familiar principles here, there is no basis to permit Stanley to amend his

claims in a Third Amended Complaint. Since initiating this lawsuit nearly five years ago,

Stanley has had three opportunities to amend his complaint, each time with the benefit of a

preview of defendants' asserted grounds for dismissal.[12] His most recent iteration of his claims,

---

[12] First, after CUNY filed its first motion to dismiss and Judge Nathan directed that Stanley
either amend his complaint or oppose the motion, *see* Dkts. 10, 13, he filed the FAC, *see* Dkt. 24.
Second, after his claims were dismissed with prejudice and the case was reopened due to his
prior counsel's conflict of interest and "poor quality of representation," Judge Nathan permitted
Stanley to file an amended complaint, *see* Dkt. 51, and Stanley filed the SAC, albeit after
numerous extensions, *see, e.g.*, Dkts. 53 (90-day extension), 56 (30-day extension), 66 (two-
week extension). Finally, after defendants filed the pending motion to dismiss, Stanley
requested, and the Court granted, multiple extensions of time to respond to the motion, *see* Dkts.
115 (60-day extension), 122 (two-week extension), in part due to the possibility that Stanley
would seek new counsel. At no point in the three months before Stanley opposed the motion and
moved to amend the SAC did he formally indicate that he sought to file a Third Amended
Complaint, despite having purportedly notified defense counsel of such an intent before
defendants moved to dismiss the SAC, *see* Dkt. 126. Stanley's first motion to amend the SAC
prolonged the briefing on the pending motion to dismiss, because defendants could file their
reply only after the Court resolved Stanley's request to file the TAC. *See* Dkt. 130 (setting reply

in the SAC, has resulted today in the dismissal of all of his federal claims. And Stanley does not

identify with sufficient specificity additional facts that he would plead that would fortify the

federal claims dismissed here.

Permitting a new round of repleading in this litigation would therefore, for no productive

purpose, further delay already long-delayed litigation and prejudice defendants in their bid for

closure. To the extent that Stanley may wish to pursue his state-law claims, over which the

Court has declined to exercise supplemental jurisdiction and which the Court has dismissed

without prejudice to refiling in state court, permitting a Third Amended Complaint would delay

the initiation of such a state lawsuit while this Court supervised a new round of motions practice

here. Because Stanley has had multiple opportunities to amend and has not identified any

additions that could resuscitate his claims, it is time for litigation in this Court over the actions

and grievances captured in the SAC and its predecessors to end, subject to Stanley's right of

appeal. *See, e.g.*, *Black v. Ganieva*, No. 22-1524, 2023 WL 2317173, at *3 (2d Cir. Mar. 2,

2023) (affirming denial of leave to amend where plaintiff "failed to follow the district court's

guidance that he would forgo further opportunity to amend by responding to the motions to

dismiss, and the district court had already denied the proposed SAC"); *Morency v. NYU Hosps.

Ctr.*, 728 F. App'x 75, 76 (2d Cir. 2018) ("[T]he liberality with which a court grants leave to

amend does not impart to litigants the privilege of re-shaping their legal theories endlessly."

(citation omitted)).

---

deadline for 30 days after decision on TAC). The Court denied Stanley's first motion to amend
the SAC, which was filed jointly with his opposition to this motion to dismiss, on the grounds
that the motion to amend had been unduly delayed and that Stanley had not explained why new
acts of retaliation could not have been included in an earlier filed Third Amended Complaint.
*See* Dkt. 128 at 2.

This ruling does not preclude Stanley from challenging his recent termination, or other actions post-dating or otherwise outside the scope of this lawsuit. But any such claims must be brought in a new lawsuit. Allowing Stanley to add them to this lawsuit would delay the closure of this litigation and any appeal from it. It would also cause undue prejudice to the defendants in this litigation—including ones who have since retired—as to whom Stanley has no basis suing in connection with his recent termination.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss. The Court dismisses all federal claims in the SAC with prejudice, and, declining to exercise supplemental jurisdiction over the SAC's state-law claims, dismisses these without prejudice to his right to pursue them in state court. The Court also denies Stanley's motion to file a Third Amended Complaint, without prejudice to Stanley's right, in a separate lawsuit, to challenge actions outside the scope of the SAC and its predecessors.

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 107 and 134 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 30, 2023
New York, New York

55